*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JONATHAN SCHIRMER,

and

DEBBIE SCHIRMER,

      Plaintiffs-Appellants,

v

JAMES ROBERT,
ROBERT L. HUNTER SR.,

and

NORTH FLIGHT, INC.,

      Defendants-Appellees.

UNPUBLISHED
July 8, 2021

No. 347378
Alpena Circuit Court
LC No. 17-008120-NO

Before: LETICA, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

Plaintiffs Jonathan and Debbie Schirmer[1] appeal as of right the trial court's order granting defendants' motion for summary disposition on their complaint alleging negligence and gross negligence against North Flight, Inc., an ambulance service, and its employees, Robert L. Hunter and James Robert.[2] On appeal, plaintiffs argue that the trial court erred in determining that

---

[1] Because the plaintiffs share their last name, we will refer to them by their first names when discussing them individually.

[2] Robert's actual name is James Robert Williams; to avoid further confusion we will identify him as he is captioned in the complaint.

defendants were entitled to immunity under the Emergency Medical Services Act (EMSA), MCL 333.20901 *et seq*. We reverse and remand.

## I. BACKGROUND

On August 2, 2016, MidMichigan Medical Center in Alpena admitted Jonathan to evaluate his elevated and increasing troponin[3] levels and over its "concern for acute NSTEMI".[4] Because Jonathan's troponin levels increased, Jonathan was to be transferred to McLaren North in Petoskey in Emmet County for NSTEMI and a cardiac catheterization. Jonathan desired treatment with his primary care physician and spent the night waiting for a bed to become available at the Petoskey hospital.

The next day, a nurse practitioner signed the North Flight EMS transfer authorization form for ambulance services from the Alpena hospital to the Petoskey hospital. It reflected that Jonathan's referring physician chose that destination. In describing Jonathan's physical condition that made "transportation by ambulance medically necessary (as opposed to any other means)," the nurse practitioner identified "NSTEMI" and "↑ troponins." She added that "[t]ravel by means other than ambulance (i.e., private vehicle) could endanger [the] patient's health" given the possibility of a "MVA" (motor vehicle accident). The nurse practitioner further described Jonathan's condition as "[g]uarded." Nevertheless, Jonathan's transfer via ambulance was not considered an emergency because he was stable.

Defendants transported Jonathan on August 3. Hunter was the ambulance's paramedic; Robert, the driver and an emergency medical technician (EMT). During this Advanced Life Support (ALS) transport, Hunter provided cardiac monitoring, continued to administer heparin intravenously, and checked Jonathan's vital signs every 30 minutes.

Once the ambulance reached Petoskey, the hospital's security camera captured what happened next. After Robert backed the ambulance into the hospital's entry way, he exited, walked to the ambulance's rear, and opened the doors. Hunter then exited and stood off to the side. Robert began the offloading process by pulling the cot out as Jonathan was strapped to it at his chest, waist, and lower legs, but not his shoulders. As Robert continued to pull, the safety hook or latch attached to the ambulance's floor did not catch the safety bar attached to the cot's head.[5] Without

---

[3] Troponin is a protein found in heart muscle fibers that regulate contractions. When the heart is injured, troponin is released into the bloodstream.

[4] NSTEMI is an abbreviation for non-ST-segment elevation myocardial infarction, more commonly known as a heart attack.

[5] Plaintiffs' expert opined that Hunter prematurely released the safety and failed to verify (visualize) the safety hook catching the safety bar. Hunter denied prematurely releasing the safety bar.

the hook stopping the cot's progress, the cot fully came out of the ambulance, knocked Robert to the ground, and fell sideways onto the pavement with Jonathan strapped to it. Both Hunter and Robert quickly attended to Jonathan, unstrapped him, and helped him onto his feet and into a standing position. Jonathan denied being injured.

During the incident, an emergency room nurse appeared and inquired whether Jonathan needed to be seen in the emergency department before being taken to his hospital room. Jonathan declined. According to Hunter, Jonathan reported he had not hit the cement hard and had tucked and rolled in order to protect his body.

Jonathan was able to sit on the cot again. Hunter and Robert then moved the cot to Jonathan's pre-arranged hospital room, where they transferred him into his hospital bed.

On November 6, 2017, plaintiffs filed a civil complaint against defendants, alleging that the incident and their physical and emotional injuries were caused by defendants' negligence or gross negligence. In particular, plaintiffs alleged that defendants "were merely transporting [Jonathan] from one location to another, and not engaged in any application of medicines, surgery, therapy, or in any treatment of any disease or disorder whatsoever." Plaintiffs further alleged "[t]hat there was no professional relationship or medical judgment between the parties . . . and the issues raised . . . are [within] common knowledge and experience." The negligence or gross negligence claim was that Robert unloaded Jonathan alone, even though this task required two attendants, and Robert lost control of the cot after the safety latch failed to catch. Among other injuries, Jonathan incurred "[s]erious injuries to his head, neck, shoulder, [and] a sheared off dental bridge . . . ."

After discovery ended, defendants moved for summary disposition. Defendants asserted that plaintiffs' negligence claim was barred in its entirety under the EMSA. In particular, the individual defendants, who were EMS-licensed personnel, provided services consistent with their

---

Because Robert could not visualize the safety hook from his position at the foot of the cot, plaintiffs' expert opined that Robert failed to look at Hunter for confirmation that the safety hook caught the safety bar and that he prematurely engaged the system to lower the wheels.

Plaintiffs' expert further opined that two operators were required to offload a patient-occupied cot.

According to Hunter and Robert, in the hundreds, if not thousands, of times they had removed a cot from the ambulance, the safety hook never failed to catch. After this incident, a supervisor inspected the safety hook and determined it was in working order.

As additional evidence of Hunter and Robert's negligence or gross negligence, plaintiffs pointed to their failure to comply with the manual accompanying the cot, which read: "Unloading the cot from the vehicle while a patient is on the cot requires a minimum of two operators" and "Always use all restraint straps to secure the patient on the cot. An unrestrained patient may fall from the cot and be injured." Hunter testified that two operators were not required to safely offload a patient-occupied cot unless the patient weighed over 300 pounds, which Jonathan did not. Hunter further testified that shoulder restraints were not always necessary.

licensure and training in their medical transport of Jonathan and it was irrelevant that Jonathan was a non-emergency patient. As to plaintiffs' gross negligence claim, there was no genuine issue of material fact as to whether the conduct at issue was grossly negligent because defendants took various steps to effectuate a safe transfer. Finally, and independent of the EMSA, defendants asserted that this case was one of medical malpractice and plaintiffs' failure to comply with statutory requirements in order to pursue a medical malpractice claim required dismissal.

Plaintiffs responded that the trial court's earlier order granting plaintiffs' motion to strike defendants' affirmative defenses related to medical malpractice, including the EMSA, dictated the outcome as this case involved only claims of negligence or gross negligence, not medical malpractice. In any event, defendants were not entitled to immunity under the EMSA. First, the EMSA's immunity "applie[d] only to care rendered in emergency situations and . . . not . . . to non-emergencies such as the transfers in this case." Second, defendants did not provide "any actual treatment" to Jonathan and were not transporting Jonathan from an accident site. Instead, "in this non-emergency situation," defendants did not provide "any 'treatment' of [] injuries requiring immediate or prompt medical care." Defendants' dropping of the cot was simply negligence or gross negligence, not medical malpractice.

Defendants replied that the EMSA "provide[d] immunity from negligence of any kind, whether ordinary negligence or professional negligence, so its applicability is not connected to whether the claim sounds in medical malpractice." And, given that the EMSA's purpose was "to provide immunity to emergency medical personnel from claims of negligence," it applied in this case. Defendants also provided the trial court with a copy of *Griffin v Swartz Ambulance Serv*, unpublished opinion per curiam of the Court of Appeals, issued November 29, 2018 (Docket No. 340480), where this Court held that " 'treatment' can be reasonably construed as including the safe and timely transportation of the patient to the hospital to receive medical care." Therefore, defendants were entitled to immunity as to plaintiffs' negligence claim. Defendants further maintained that this case involved medical malpractice because "[p]laintiffs' claims raised questions of medical judgment [the movement or transportation of a patient] beyond the realm of common knowledge and experience." And, contrary to plaintiffs' assertion that the trial court's earlier ruling striking defendants' affirmative defenses related to medical malpractice decided these issues, defendants explained that discovery revealed a factual basis for their affirmative defenses as well as inaccuracies in plaintiffs' complaint.

After plaintiffs' counsel informed the trial court of his intention not to attend the hearing, only defense counsel appeared. The trial court took the matter under advisement, indicating that it would review *Griffin* before rendering its decision.

The next day, the trial court issued an opinion and order granting defendants' motion for summary disposition based on the EMSA. The trial court rejected plaintiffs' first argument because the EMSA did not distinguish emergency from nonemergency situations, and, in fact, the statutory definition of a patient encompassed both an emergency and a nonemergency patient. Turning to plaintiffs' second argument, the trial court looked to *Griffin*, employed the dictionary definition of "treatment," and concluded:

> Although defendants may not have been providing "actual medical services," they were nonetheless providing treatment within the scope of their

duties and training while caring for an ambulance patient. This conduct qualifies as "treatment of a patient" for purposes of EMSA, and is therefore entitled to its immunity protections.

Lastly, the trial court determined that defendants' conduct did not amount to gross negligence or willful misconduct.

This appeal as of right followed.[6]

## II. STANDARD OF REVIEW

We review de novo the trial court's grant of summary disposition as well as the applicability of immunity. See *Moraccini v Sterling Heights*, 296 Mich App 387, 391; 822 NW2d 799 (2012). Summary disposition under MCR 2.116(C)(7) is proper when a claim is barred because of immunity granted under the law. We consider all documentary evidence in a light most favorable to the nonmoving party under MCR 2.116(C)(7). *Id.* "If there is no factual dispute, whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide." *Id.* (quotation marks and citation omitted). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim and may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012).

We review questions of statutory interpretation de novo. *Edw. C. Levy Co v Marine City Zoning Bd of Appeals*, 293 Mich App 333, 339; 810 NW2d 621 (2011). "The primary goal of statutory interpretation is to give effect to the intent of the Legislature." *Briggs Tax Serv, LLC v Detroit Pub Sch*, 485 Mich 69, 76; 780 NW2d 753 (2010). The best indicator of the Legislature's intent is the statute's language, which, if clear and unambiguous, we must apply as written. *Ford Motor Co v City of Woodhaven*, 475 Mich 425, 438-439; 716 NW2d 247 (2006). Our courts are further guided by MCL 8.3a, which reads:

> All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning. [*Ford Motor Co*, 475 Mich at 439.]

And courts " 'interpret th[e] words in [a statute in] light of their ordinary meaning and their context within the statute and read them harmoniously to give effect to the statute as a whole.' " *Johnson v Recca*, 492 Mich 169, 177; 821 NW2d 520 (2012), quoting *People v Peltola*, 489 Mich 174, 181;

---

[6] We issued an order holding this case in abeyance based on our Supreme Court's order scheduling oral argument on the application for appeal in *Griffin v Swartz Ambulance Serv*, 504 Mich 968; 933 NW2d 43 (2019). *Schirmer v Robert*, unpublished order of the Court of Appeals, entered December 5, 2019, (Docket No. 347378). The abeyance concluded on September 11, 2020, when the Supreme Court denied leave to appeal. *Griffin v Swartz Ambulance Serv*, ___ Mich ___; 947 NW2d 826 (2020).

803 NW2d 140 (2011).  "In doing so, courts 'must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory.' "  *Id.*, quoting *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002).

## III.  ANALYSIS

Plaintiffs argue that defendants' dropping of the cot did not constitute "treatment" under the EMSA.  Rather, it was transportation and, thus, plaintiffs were only required to prove ordinary negligence.  We agree.

The EMSA provides immunity for those who satisfy its criteria.  MCL 333.20965 states:

(1) Unless an act or omission is the result of gross negligence or willful misconduct, the acts or omissions of a medical first responder, emergency medical technician, emergency medical technician specialist, paramedic, medical director of a medical control authority or his or her designee, or, subject to subsection (5),[7] an individual acting as a clinical preceptor of a department-approved education program sponsor while providing services to a patient outside a hospital, in a hospital before transferring patient care to hospital personnel, or in a clinical setting that are consistent with the individual's licensure or additional training required by the medical control authority including, but not limited to, services described in subsection (2),[8] or consistent with an approved procedure for that particular education program do not impose liability in the treatment of a patient on those individuals or any of the following persons:

* * *

(d) The life support agency or an officer, member of the staff, or other employee of the life support agency.  [MCL 333.20965(1) and (1)(d).]

---

[7] "The limitation on liability granted to a clinical preceptor under subsection (1) applies only to an act or omission of the clinical preceptor relating directly to a student's clinical training activity or responsibility while the clinical preceptor is physically present with the student during the clinical training activity, and does not apply to an act or omission of the clinical preceptor during that time that indirectly relates or does not relate to the student's clinical training activity or responsibility."

[8] "(2) Subsection (1) applies to services consisting of any of the following:

(a) The use of an automated external defibrillator on an individual who is in or is exhibiting symptoms of cardiac distress.

(b) The administration of an opioid antagonist to an individual who is suffering or is exhibiting symptoms of an opioid-related overdose."

Accordingly, the EMSA shields an EMT, paramedic, and a life support agency from liability where "the acts or omissions of a[n] . . . [EMT or a] paramedic . . . while providing services to a patient outside a hospital . . . that are consistent with the individual's licensure or additional training required by the medical control authority . . . or [are] consistent with an approved procedure for that particular education program . . . in the treatment of a patient," unless the EMT or paramedic's acts or omissions are willful misconduct or gross negligence. *Id*.

At issue in this case is whether the dropping of the cot at the conclusion of the ambulance transport was "in the treatment of a patient." The EMSA does not define the term "treatment," but the word "patient" encompasses "an emergency patient or a nonemergency patient." MCL 333.20908(6). A nonemergency patient is "an individual who is transported by stretcher, isolette, cot, or litter but whose physical or mental condition is such that the individual may reasonably be suspected of not being in imminent danger of loss of life or of significant health impairment." MCL 333.20908(1).

The question of what constitutes treatment under the EMSA's protection from liability was addressed in *Griffin*, which the trial court in this case followed in granting defendants' motion for summary disposition. In *Griffin*, the defendant ambulance service was transporting the plaintiff, who had suffered a dislocated knee in an automobile accident, to the hospital; en route, the ambulance collided with another vehicle. *Griffin*, unpub op at 1. The plaintiff sued the defendant, alleging that its employee, an EMT/medical first responder, who was driving the ambulance, "was negligent in causing the second accident[.]" *Id*. at 1-2. The defendant moved for summary disposition under the EMSA, "which establishes immunity for EMTs and other medical first responders who provide services in treatment of a patient absent a showing of gross negligence or willful misconduct." *Id*. at 2. As the plaintiff's evidence, at best, demonstrated that the defendant's employee was negligent, the defendant asserted that "it was immune from liability under the EMSA." *Id*. The trial court granted the defendant's motion and the plaintiff appealed. *Id*.

In a divided decision, the *Griffin* majority began by recognizing that the defendant, an ambulance operation, qualified as a life support agency under MCL 333.20906(1). *Id*. at 3. The majority further recognized that "EMTs and 'medical first responder[s],' " were also entitled to immunity, with the latter term being defined as:

> an individual who has met the educational requirements of a department approved medical first responder course and who is licensed to provide medical first response life support as part of a medical first response service *or as a driver of an ambulance that provides basic life support services only*. Medical first responder does not include a police officer solely because his or her police vehicle is equipped with an automated external defibrillator. [*Id*.]

"Although the definition of medical first responder indicates that an ambulance driver may qualify for immunity under the EMSA," this Court still had to decide whether the employee's operation of the ambulance qualified "as conduct involving 'the treatment of a patient' " under the EMSA. *Id*. Because "treatment" was undefined, the panel majority looked to the dictionary definition to discern the word's ordinary meaning. *Id*. at 4, citing *Koontz v Ameritech Servs*, 466 Mich 304, 312; 645 NW2d 34 (2002). The majority then defined treatment as:

> **a:** the act or manner or an instance of treating someone or something: HANDLING, USAGE <the star requires careful ~ > **b:** the techniques or actions customarily applied in a specified situation. [*Id*., quoting *Merriam-Webster's Collegiate Dictionary* (11th ed).]

Using this definition, the majority determined that " 'treatment' would include the handling of a patient in an ambulance or the techniques customarily applied when caring for ambulance patients, consistent with the training of first responders." *Id*. Accordingly, " 'treatment' would not be limited to actual medical services rendered to patients being transported by ambulance but would include activities by first responders acting within the scope of their duties and training as first responders." *Id*. The majority concluded that EMSA's immunity applied to the employee's "operation of the ambulance as a motor vehicle . . . where the operation was serving the needs of [the] plaintiff, a patient seeking immediate medical care." *Id*. The "[p]laintiff was being transported from an accident site to a hospital to receive immediate medical treatment for an injury." *Id*. The transport was "a 'Priority 2' run, meaning that they wanted to get to the hospital as quickly as possible, even though the lights and siren were not activated." *Id*. In light of the circumstances, the employee's "operation of the ambulance at the time of the second accident qualifie[d] as conduct involving 'the treatment of a patient' " under the EMSA. *Id*.

Although the *Griffin* dissent agreed that employing a dictionary definition to define "treatment" was appropriate, it looked to another dictionary for its definition. *Griffin*, unpub op at 2 (M.J. KELLY, P.J., dissenting). Under that definition, " 'treatment' consist[ed] of '[m]anagement in the application of remedies; medical or surgical application or service.' " *Id*., quoting *Oxford English Dictionary* (2d ed). Because "the record reflect[ed] that at the time of the motor-vehicle accident the ambulance driver was not undertaking any action to manage [the] plaintiff's injuries," but "was merely transporting [the plaintiff] to the hospital while the paramedic in the patient-compartment of the ambulance provided treatment," the dissent concluded that the defendant was not entitled to immunity under the EMSA. *Griffin*, unpub op at 2 (M.J. KELLY, P.J., dissenting).

The *Griffin* plaintiff appealed to the Supreme Court and it scheduled oral argument to address "whether the operation of the ambulance . . . by the [defendant's] employee constitutes an 'act[] . . . in the treatment of a patient' within the meaning of MCL 333.20965(1)." *Griffin v Swartz Ambulance Serv*, 504 Mich 968, 968; 933 NW2d 43 (2019). Following oral argument, and over two separate dissents, the Supreme Court reconsidered the *Griffin* plaintiff's application for leave to appeal and denied it because it was "not persuaded that the question presented should be reviewed by this Court." *Griffin v Swartz Ambulance Serv*, ___ Mich ___, ___; 947 NW2d 826 (2020).

Justice Zahra, joined by Justice Markman, dissented. *Id*. at ___; 947 NW2d at 826 (ZAHRA, J., dissenting). Justice Zahra expressed agreement with the plaintiff's position that immunity under the EMSA did "not apply to these circumstances because the second accident occurred during *transportation* and not while [the] plaintiff was receiving any kind of medical *treatment*." *Id*. at ___; 947 NW2d at 826-827. Recognizing that resorting to dictionary definitions was permissible when a statutory term was left undefined, the dissent concluded it was unhelpful in resolving the question "as some [definitions] support the notion that 'treatment,' in this context, includes 'transportation,' while others support the opposite conclusion." *Id*. at ___; 947 NW2d at 828. Rather, viewing the EMSA as a whole, Justice Zahra's dissent observed that it "uses the words

-8-

'treatment' and 'transport' in close conjunction, yet clearly denoting *separate and distinct* concepts." *Id.* For example,

> [a]n "ambulance operation," as defined by MCL 333.20902(5), "means a person licensed under this part to provide *emergency medical services and patient transport*, for profit or otherwise." "Emergency medical services" are defined under MCL 333.20904(4) as "the emergency medical services personnel, ambulances, nontransport prehospital life support vehicles, aircraft transport vehicles, medical first response vehicles, *and equipment required for transport or treatment of an individual* requiring medical first response life support, basic life support, limited advanced life support, or advanced life support." In this way, the EMSA uses the word "treatment" and then, *separately*, uses the word "transport" to describe different functions of equipment used to provide varying degrees of life support. Thus, as far as "emergency medical services" under MCL 333.20902(5) are concerned, "treatment" is not synonymous with "transport"—even if neither term is defined by statute. Turning back to the statutory definition provided for "ambulance operations," one should note that "emergency medical services"— which includes the equipment *used for* treatment and transport of individuals—is separate from "patient transport." [*Id.* at ___; 947 NW2d at 828-829 (footnotes omitted).]

Moreover, Justice Zahra's dissent noted that MCL 333.20969 also distinguishes treatment from transportation:

> This part and the rules promulgated under this part do not authorize medical treatment for or transportation to a hospital of an individual who objects to the *treatment or transportation.* However, if emergency medical services personnel, exercising professional judgment, determine that the individual's condition makes the individual incapable of competently objecting to *treatment or transportation*, emergency medical services may provide *treatment or transportation* despite the individual's objection unless the objection is expressly based on the individual's religious beliefs. [*Id.* at ___; 947 NW2d at 829 (footnotes omitted).]

This "suggests that 'emergency medical services,' which include[s] 'ambulances,' can be used in certain circumstances for either 'treatment *or* transportation.' " *Id.* (footnote omitted). The dissent expressed its concern that this Court had "improperly construed the EMSA" and would have granted the application "to explore these aspects of the EMSA . . . ." *Id.* at ___; 947 NW2d at 830.

Justice Viviano separately dissented and would have "grant[ed] leave to consider whether the term 'treatment' [as used in MCL 333.20965(1) was] ambiguous." *Id.* at ___; 947 NW2d at 830 (VIVIANO, J., dissenting). Justice Viviano agreed with Justice Zahra that the repeated, separate use of "transport" and "treatment," "indicates that the terms ha[d] two separate meanings, and that 'treatment' does not include 'transport.' " *Id.* at ___; 947 NW2d at 830-831. Justice Viviano would have granted leave, in part, to address whether the dictionary definitions applied by this Court created an ambiguity regarding the meaning of treatment under the EMSA. *Id.* at ___; 947 NW2d at 830-833.

The *Griffin* plaintiff later filed a motion for reconsideration, which the Supreme Court unanimously denied. *Griffin v Swartz Ambulance, Inc*, 506 Mich 950; 950 NW2d 49 (2020).

In a recent 2-1 decision, however, this Court agreed with Justice Zahra's *Griffin* dissent and "conclude[d] that the mere transportation of a patient is not sufficient to meet the requirement that the act or omission causing the injury occur 'in the treatment of a patient' under MCL 333.20965(1)." *Bartalsky v Osborn*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 349317); slip op at 1. In *Bartalsky*, the defendants, two EMTs, transported the plaintiff to a hospital "for evaluation of a nonemergency condition." *Id.* at ___; slip op at 2. The hospital evaluated the plaintiff and discharged him. *Id.* The defendants were taking the plaintiff out of the hospital on a stretcher when its wheels " 'hit some debris,' causing the stretcher to 'tip over' and [the] plaintiff's left shoulder and hip to strike the pavement." *Id.* The plaintiff further alleged that the defendants' negligence continued and that they enabled a second fall. *Id.* The plaintiff suffered a broken hip and sued the defendants, "alleging both negligence and professional malpractice, but not gross negligence." *Id.* The defendants, including the life-support agency they worked for, moved for summary disposition under the EMSA, which the trial court granted. *Id.*

On appeal, this Court explained that "the key question . . . is whether 'transportation' alone—emergency or otherwise—qualifies for immunity under MCL 333.20965(1) of the EMSA." *Id.* at ___; slip op at 4. This Court "agree[d] with the parties that [the] defendants were transporting [the] plaintiff within the meaning of the EMSA . . . ." *Id.* at ___; slip op at 6. And this Court further agreed that the EMSA "uses the terms 'treatment' and 'transport' to mean different activities," holding:

> The activities could occur at the same time, e.g., a patient could be transported in an ambulance while being provided medical treatment, but the activities remain conceptually separate. Under the EMSA, a covered individual must be, among other things, engaged 'in the treatment of a patient' for the immunity provision to apply. MCL 333.20965(1). Therefore, because [the] plaintiff's ordinary-negligence and medical-malpractice claims are premised on defendants' acts or omissions involved with his transportation in the hospital parking lot and not any treatment provided to him, the immunity for negligent acts or omissions under MCL 333.20965(1) does not apply to those claims.

> \* \* \*

> With the EMSA, the Legislature provided immunity to EMTs and other covered persons and entities for certain acts or omissions that do not rise to the level of gross negligence or willful misconduct. But to qualify for immunity, a defendant must show, among other things, that the act or omission was taken "in the treatment of a patient." MCL 333.20965(1). This requirement is fatal to defendants' claim of immunity here because, as the record makes clear, the EMTs were merely transporting plaintiff in a stretcher across a hospital parking lot. While defendants argue that public policy supports a broader meaning of the term "treatment," the EMSA treats the term "transport" separate and distinct from the term "treatment." It is for the Legislature, not this Court, to decide whether defendants have the better public-policy argument. [*Id.* at ___; slip op at 7.]

-10-

We agree with *Bartalsky*, and are bound to follow it under MCR 7.215(J)(1). Although Hunter provided treatment to Jonathan during the ambulance transport, plaintiffs allege that Jonathan was injured during transport on the cot, not from the treatment Hunter provided. Because treatment and transport have distinct meanings under the EMSA, defendants are not shielded from liability.[9]

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Michael J. Riordan
/s/ Thomas C. Cameron

---

[9] We decline to address defendants' alternative argument for summary disposition as the trial court did not reach it. On remand, the court remains free to consider this alternative ground.